No. 23-50075

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Plaintiff-Appellant,

v.

U.S. DRUG MART, INCORPORATED, doing business as FABENS
PHARMACY,
Defendant-Appellee.

On Appeal from the United States District Court
for the Western District of Texas, No. 3:21-cv-232
Hon. Frank Montalvo, United States District Judge

OPENING BRIEF OF THE EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION AS APPELLANT

GWENDOLYN YOUNG REAMS
Acting General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

DARA S. SMITH
Assistant General Counsel

JEREMY D. HOROWITZ
Attorney

U.S. EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St., N.E., Fifth Floor
Washington, D.C. 20507
(202) 921-2549
jeremy.horowitz@eeoc.gov

No. 23-50075

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
Plaintiff-Appellant,

v.

U.S. DRUG MART, INCORPORATED, doing business as FABENS
PHARMACY,
Defendant-Appellee.

_____

### CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed

persons and entities as described in the fourth sentence of Fifth Circuit

Rule 28.2.1 have an interest in the outcome of this case. These

representations are made in order that the judges of this Court may

evaluate possible disqualification or recusal.

Anderson, Suzanne M., Attorney, EEOC

Calzada, David, Charging Party

Canino, Robert, Regional Attorney, EEOC

Clark, Joel P., Attorney, EEOC

Dallas, Cassie J., Counsel for Defendant-Appellee

Equal Employment Opportunity Commission, Plaintiff-Appellant

Frizzelle, Amanda, Attorney, EEOC

Goldstein, Jennifer S., Associate General Counsel, EEOC

Horowitz, Jeremy D., Attorney, EEOC

Moscowitz, Barry A., Counsel for Defendant-Appellee

Reams, Gwendolyn Young, Acting General Counsel, EEOC

Smith, Dara S., Assistant General Counsel, EEOC

U.S. Drug Mart, Inc., d/b/a Fabens Pharmacy, Defendant-Appellee

Woody, Jordan P., Counsel for Defendant-Appellee

/s/ Jeremy D. Horowitz
JEREMY D. HOROWITZ
Attorney
U.S. EQUAL EMPLOYMENT
 OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., Fifth Floor
Washington, D.C. 20507
(202) 921-2549
jeremy.horowitz@eeoc.gov

Dated: April 11, 2023

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Equal Employment Opportunity Commission ("EEOC") requests oral argument.  In this enforcement action, the EEOC claims that Defendant-Appellee U.S. Drug Mart, Inc. ("U.S. Drug Mart") discriminated against Charging Party David Calzada in violation of the Americans with Disabilities Act ("ADA") by harassing him after Calzada requested to wear a mask during the early days of the COVID-19 pandemic.  Calzada requested the mask as a reasonable accommodation to protect him from the higher risk he faced from COVID due to his disability, asthma.  The district court granted U.S. Drug Mart's motion for summary judgment because it believed that the harassment Calzada faced—being sent home twice without pay, and then being harangued, belittled, and insulted by his managers and threatened with termination—was not sufficiently severe to alter the terms or conditions of his employment and establish a hostile work environment under the ADA under this Court's precedents.  Because it found that the EEOC could not establish its hostile

i

work environment claim, the court believed it was constrained to rule

against the EEOC on its constructive discharge claim as well.

The EEOC believes oral argument would help clarify the legal and

factual issues in this case, including issues the opinion below may not have

fully explored.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ............................................. i

TABLE OF AUTHORITIES .................................................................... v

STATEMENT OF JURISDICTION ......................................................... 1

STATEMENT OF THE ISSUES ............................................................. 1

STATEMENT OF THE CASE ................................................................ 2

   A.  Course of Proceedings ................................................................ 2

   B.  Statement of the Facts ............................................................... 4

   C.  District Court's Decision ............................................................ 12

STANDARD OF REVIEW ................................................................... 15

SUMMARY OF ARGUMENT ............................................................... 16

ARGUMENT ................................................................................... 19

I.   A Reasonable Jury Could Have Found that Calzada's Supervisors
    Subjected Him to Harassment that Was Sufficiently Severe to Alter the
    Terms or Conditions of His Employment and Create an Abusive
    Working Environment. ................................................................. 19

   A.  A plaintiff establishes a hostile work environment claim with
     evidence of harassment that is sufficiently severe or pervasive to alter
     the terms or conditions of the victim's employment. ......................... 19

B.  Taking into account the full context of the harassment Calzada faced, a reasonable jury could find that it met the standard for a hostile work environment. ...................................................................................24

C.  The cases the district court relied on to conclude that the harassment was insufficiently severe to meet this Court's hostile work environment standard are distinguishable.............................................36

D.  U.S. Drug Mart's claim that the harassment stemmed from Calzada's "attitude" rather than his disability does not support summary judgment. ...................................................................................................42

II.  A reasonable jury could agree with the district court and find that a reasonable person in Calzada's position would have felt compelled to resign. ..............................................................................................46

CONCLUSION ....................................................................................................48

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abramson v. William Paterson Coll. of N.J.,*
260 F.3d 265 (3d Cir. 2001) ..............................................................21

*Berry v. Chi. Transit Auth.,*
618 F.3d 688 (7th Cir. 2010) ............................................................35

*Bourque v. Powell Elec. Mfg. Co.,*
617 F.2d 61 (5th Cir. 1980) ..............................................................46

*Brooks v. Grundmann,*
748 F.3d 1273 (D.C. Cir. 2014) ........................................................40

*Brown v. Kinney Shoe Corp.*
237 F.3d 556 (5th Cir. 2001) ............................................................47

*Burlington Indus., Inc. v. Ellerth,*
524 U.S. 742 (1998) .............................................................23, 29, 30

*Clark v. Champion Nat'l Sec., Inc.,*
952 F.3d 570 (5th Cir. 2020) ......................................................22, 31

*Credeur v. La. Through Off. of Att'y Gen.,*
860 F.3d 785 (5th Cir. 2017) ......................................................20, 31

*EEOC v. Boh Bros. Constr. Co.,*
731 F.3d 444 (5th Cir. 2013) (en banc) ......................................19, 22

*EEOC v. LHC Grp., Inc.,*
773 F.3d 688 (5th Cir. 2014) ......................................................15, 16

*EEOC v. Mgm't Hosp. of Racine, Inc.,*
666 F.3d 422 (7th Cir. 2012) ......................................................23, 30

*Faragher v. City of Boca Raton,*
    524 U.S. 775 (1998)..................................................................*passim*

*Flowers v. S. Reg'l Physician Servs. Inc.,*
    247 F.3d 229 (5th Cir. 2001)..................................................*passim*

*Fox v. Gen. Motors Corp.,*
    247 F.3d 169 (4th Cir. 2001).........................................................20

*Green v. Brennan,*
    578 U.S. 547 (2016).......................................................................46

*Harris v. Forklift Sys., Inc.,*
    510 U.S. 17 (1993).........................................................................23

*Haysman v. Food Lion, Inc.,*
    893 F. Supp. 1092 (S.D. Ga. 1995)..........................................20, 44

*Hickman v. Laskodi,*
    45 F. App'x 451 (6th Cir. 2002) ...................................................35

*Holloway v. Maryland,*
    32 F.4th 293 (4th Cir. 2022)...............................................27, 40, 41

*Ibraheem v. Wackenhut Servs., Inc.,*
    29 F. Supp. 3d 196 (E.D.N.Y. 2014) ............................................21

*Kelley v. Corr. Med. Servs., Inc.,*
    707 F.3d 108 (1st Cir. 2013) .........................................................44

*Lauderdale v. Tex. Dep't of Crim. Just.,*
    512 F.3d 157 (5th Cir. 2007)..........................................................46

*Mathirampuzha v. Potter,*
    548 F.3d 70 (2d Cir. 2008)............................................................35

*Miller v. Ill. Dep't of Transp.,*
    643 F.3d 190 (7th Cir. 2011)..........................................................44

*Morris v. City of Colorado Springs*,
   666 F.3d 654 (10th Cir. 2012)...................................................33, 34, 42

*Oncale v. Sundowner Offshore Servs., Inc.*,
   523 U.S. 75 (1998).........................................................................22, 35

*Pa. State Police v. Suders*,
   542 U.S. 129 (2004).............................................................................46

*Paskert v. Kemna-ASA Auto Plaza, Inc.*,
   950 F.3d 535 (8th Cir. 2020).................................................................41

*Pennington v. Tex. Dep't of Fam. & Protective Servs.*,
   No. A-09-CA-287, 2010 WL 11519268 (W.D. Tex. Nov. 23,
   2010) ....................................................................................................39

*Perret v. Nationwide Mut. Ins. Co.*,
   770 F.3d 336 (5th Cir. 2014).................................................................46

*Saketkoo v. Adm'rs of Tulane Educ. Fund*,
   31 F.4th 990 (5th Cir. 2022)............................................................38, 39

*Scaife v. U.S. Dep't of Veterans Affs.*,
   49 F.4th 1109 (7th Cir. 2022)................................................................41

*Septimus v. Univ. of Hous.*,
   399 F.3d 601 (5th Cir. 2005).......................................................26, 37, 38

*Septimus v. Univ. of Hous.*,
   Civ. No. H-00-3307, slip op. (S.D. Tex. Jan. 24, 2002) ..............37, 38

*Shellenberger v. Summit Bancorp, Inc.*,
   318 F.3d 183 (3d Cir. 2003).................................................................44

*Thompson v. Microsoft Corp.*,
   2 F.4th 460 (5th Cir. 2021)...................................................................19

vii

**Statutes**

28 U.S.C. § 1291................................................................................1

28 U.S.C. § 1331................................................................................1

28 U.S.C. § 1343................................................................................1

28 U.S.C. § 1345................................................................................1

Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ....................*passim*

**Other Authorities**

29 C.F.R. § 1630.12(b) ........................................................................20

## STATEMENT OF JURISDICTION

The Equal Employment Opportunity Commission ("EEOC" or

"Commission") brought this enforcement action against Defendant U.S.

Drug Mart, Inc. ("U.S. Drug Mart"), pursuant to Title I of the Americans

with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. §§ 12101 *et

seq.* ROA.5.[1]  The district court had jurisdiction under 28 U.S.C. §§ 1331,

1343, and 1345.  The district court entered final judgment on October 18,

2022.  ROA.444 (RE.7).  The EEOC timely appealed on December 15, 2022.

ROA.445-46 (RE.5-6).  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  During the early days of the COVID-19 pandemic, David Calzada

sought to wear a mask at the pharmacy where he worked in order to

protect himself from the heightened risk of COVID he faced because he

suffers from asthma.  Could a reasonable jury find that U.S. Drug Mart's

actions in twice sending Calzada home without pay when he sought to

wear a protective mask, and then berating the twenty-year-old in

---

[1] Citations with the form "ROA.XX" refer to the Record on Appeal, and
parallel citations with the form "RE.XX" refer to the Record Excerpts.

1

demeaning and humiliating terms and threatening him with termination in response to his renewed mask request, were sufficiently severe to alter the terms or conditions of his employment and establish a hostile work environment under the ADA?

2.  Could a reasonable jury find that the harassment leading Calzada to quit constituted a constructive discharge?

## STATEMENT OF THE CASE

### A.  Course of Proceedings

This is an appeal from the district court's award of summary judgment on the EEOC's ADA enforcement action against U.S. Drug Mart. The EEOC filed its complaint on September 24, 2021.  ROA.5.  The complaint alleged that U.S. Drug Mart discriminated against Calzada in violation of the ADA by subjecting him to a hostile work environment in response to his request for a reasonable accommodation based on his disability.  The complaint further alleged that the harassment resulted in Calzada's constructive discharge.  ROA.5, 8-9.

The district court granted summary judgment in favor of U.S. Drug Mart.  The court acknowledged that the allegations in the case "raise a question of fact ill-suited for resolution at the summary judgment stage," and believed that "a trier of fact could find the harassment here sufficiently severe that it altered the conditions of Mr. Calzada's employment, created an abusive working environment, and interfered with his opportunity to succeed in the workplace."  ROA.438-39 (RE.22-23).  But the court nevertheless concluded that this Court's precedent required it to find that the harassment was not severe enough to establish a hostile work environment claim because it involved "an isolated incident of verbal harassment" that did not include the use of "extraordinarily offensive racial epithets."  ROA.439-42 (RE.23-26).  In the absence of a valid harassment claim, the court concluded that the "graver" constructive discharge claim failed as well, even though "the evidence raises a genuine issue of fact as to whether a reasonable person in Mr. Calzada's position would have felt compelled to resign."  ROA.442-43 (RE.26-27).

This appeal followed.  ROA.445-46 (RE.5-6).

## B.    Statement of the Facts

David Calzada began working for U.S. Drug Mart as a

Clerk/Pharmacy Technician Trainee in August 2018, when he was eighteen

years old.  ROA.259, 369-70.  Calzada also worked as a volunteer firefighter

during this period.  ROA.266, 348 (RE.48, 32).  Steve Mosher was the

Pharmacist in Charge at the pharmacy, and Ana Navarrette, his wife, was

its Store Manager.  ROA.259, 330.  Mosher and Navarrette were jointly in

charge of hiring and discipline for the pharmacy.  ROA.298, 301, 303-04.

Calzada suffers from asthma, ROA.256-57, 354, which he disclosed to

Mosher and Navarrette during his job interview, ROA.261.  He used an

albuterol inhaler at the pharmacy to control his asthma symptoms, which

included breathing difficulties, shortness of breath, and pain and pressure

in his chest.  ROA.257-58, 261-65.

On March 26, 2020, as COVID cases began spreading within the

United States, Calzada obtained a surgical mask from his father and

discussed with Navarrette whether he could wear it at work to protect

himself from COVID in light of his asthma.  ROA.266-67 (RE.48-49).  As the

4

district court noted, fifteen days prior to this conversation, the World

Health Organization ("WHO") "declared COVID-19 a pandemic,

amplifying the country's fears and apprehensions."  ROA.438 (RE.22)

(citing Center for Disease Control and Prevention, "CDC Museum COVID-

19 Timeline," https://www.cdc.gov/museum/timeline/covid19.html).  "At

the time," as the court recognized, "the only known defense to this highly

contagious virus was prevention."  ROA.438 (RE.22).  Indeed, the fire

station where Calzada volunteered had already begun implementing

COVID-prevention protocols, meaning that the pharmacy was, in

Calzada's estimation, "the only place where I'm liable to get sick."

ROA.348 (RE.32).  Calzada felt especially fearful of potential COVID

exposure at that point because a customer had recently visited the

pharmacy after returning from California (where many COVID cases had

already been documented) and indicated that she had a headache, fever,

and body aches.  ROA.346-47 (RE.30-31).

    Navarrette was unmoved by Calzada's expressed fears, however.

She instructed him to remove the mask in accordance with the instructions

of U.S. Drug Mart's Chief Operating Officer ("COO"), David Paschal, who

had said he did not want his employees wearing masks because he did not

want customers to think the employees were sick.  ROA.266-67 (RE.48-49).

Calzada objected, telling her he needed the mask "for my health because of

the asthma."  ROA.266-67 (RE.48-49).  Navarrette responded that he could

either take off the mask and continue working or clock out and go home.

ROA.268 (RE.50).  Calzada chose that latter option and left without pay.

ROA.268 (RE.50).

The next day, when Calzada was not scheduled to work, U.S. Drug

Mart changed its policy: it restricted customer access exclusively to the

store's drive-through window, and it provided masks and gloves for

employees who wanted them.  ROA.354, 359.  But Navarrette did not

inform Calzada of the change, even though she knew about his concern.

The day after the policy change, when Calzada appeared for his next shift,

Senior Pharmacy Tech Roberto Primero told him he had been taken off the

schedule and would need to speak with Navarrette or Mosher (who were

not present) before he could resume working.  ROA.268-69 (RE.50-51).

Again, Calzada went home without pay.  ROA.269 (RE.51).

When Calzada arrived for his next scheduled shift two days later, on

March 30, he spoke with Navarrette and Mosher and recorded the

conversation on his cell phone.  ROA.270, 272, 344-61 (RE.52, 28-44).

During this conversation, other employees coming into the store to start

their workday walked past the three.  ROA.309-10.  Navarrette indicated

that, beginning the previous Friday (March 27), she had allowed anyone

who wanted to do so to wear a mask.  ROA.359.  But she and Mosher

chastised Calzada for what they perceived as his "attitude" in demanding

that he be allowed to wear a mask.  ROA.348-50, 357 (RE.32-34, 41).

Mosher described Calzada as showing "complete lack of respect for his

superior," ROA.348 (RE.32), and, referring to Calzada's insistence that he

be allowed to wear a mask to protect himself from COVID-19, Mosher said

that while it was Navarrette's decision not to fire him, "I'd have sent you

packing, and you'd never come back.  You ought to be thankful that

[Navarrette]'s not like me."  ROA.349 (RE.33).  Mosher continued:

7

You need to learn there's an attitude that comes from you that needs to be disciplined and controlled. We know that you're acting like a little kid, but we're not going to put up with it. The thing is, you're going to be treated like a little kid when you act like a little kid towards us. Okay? You never go to your employer and tell them, basically, I don't care what you say. I'm doing whatever I want. That's what little kids do, and they usually get locked in their rooms for a while or even spanked because they don't treat their parents or their whatever that way. You don't talk to somebody who is your supervisor that way. … [Y]ou know what? I would still fire your ass right now, but it's not up to me. It's up to [Navarrete]. I mean, you are a disrespectful, stupid little kid. And I don't care if you got a recorder on. I don't care who you play that back to. I'm right, and you're stupid as you can be. You're acting like a five-year-old child.

ROA.350-52 (RE.34-36).

Mosher also indicated that if Calzada objected to being forbidden from wearing a mask, his only option was to be "respectful" and quit; he did not have the right to insist on masking to protect himself. ROA.351-52 (RE.35-36). Navarrete also told Calzada that he was being "really disrespectful," had a poor "attitude," and should have acted more like another employee who raised masking concerns but said, "If I can't wear it, well, I won't wear it, and that's that." ROA.349, 357 (RE.33, 41). When Calzada explained, "[i]f I can't wear a mask and I bring this home, that's it

for me," ROA.349 (RE.33), and protested that he "need[ed] to be protected"

from the virus, ROA.352 (RE.36), Mosher taunted, "Your protection is to

walk out the door and never come back.  You don't have to come in here

and wear a mask.  That's obviously something that scares you to death, so

why are you even here now?"  ROA352-53 (RE.36-37).  Calzada began

crying while Mosher berated him.  ROA.311.

Listening to the recording of the conversation during his deposition,

Mosher admitted that he had "subjected David Calzada to an intimidating

verbal attack … [t]he point of which was to be threatening," ROA.293; *see*

*id.* at ROA.287 (RE.54), noted that he had "said some things that [he]

shouldn't have said," ROA.289 (RE.56), characterized the interaction as

"[o]ne five-year-old kid talking to another five-year-old kid," ROA.290

(RE.57), attributed his comments to "stupidity" on his part, ROA.290

(RE.57), and acknowledged that telling Calzada that his choice was to

remain maskless or quit had been "ill-advised," ROA.288-89 (RE.55-56).

He also admitted that his conduct violated U.S. Drug Mart's Workplace

Violence Prevention Policy, which mandates treating "[a]ll employees" with "courtesy and respect at all times."  ROA.291 (RE.58).

Navarrette, Mosher's wife, ROA.326, tried to calm Mosher down during the conversation, agreed that Mosher had acted inappropriately, and told him afterwards that his behavior had been "unacceptable … and he needed to change his attitude."  ROA.313, 318.  She also testified that Mosher "felt … really bad about the way he had reacted that morning."  ROA.318.

Calzada began working after the meeting, then went home on his lunch break.  While at home, he recounted the conversation to his parents and began crying again.  Feeling humiliated and degraded by Mosher's comments, Calzada decided to quit.  ROA.276-77.

Calzada filed a charge of discrimination with the EEOC in which he stated that he had notified his supervisors and coworkers about his asthma from the beginning of his employment at U.S. Drug Mart.  ROA.362.  He asserted that he requested masking as an accommodation in March 2020 to avoid getting COVID, which posed an outsized risk to him because of his

asthma.  ROA.362.  Calzada alleged that Navarrette and Mosher both told him he was not allowed to wear a mask to work at COO Paschal's direction, and that he "felt no other choice but to quit [his] employment" because that decision put his "health … in danger."  ROA.362.  He also noted Mosher's statement that he "would be fired for requesting such an accommodation if it were up to him."  ROA.362.

Following an investigation, the EEOC found "reasonable cause to believe that [U.S. Drug Mart] discriminated against [Calzada] because of his disability in violation of the ADA by denying him a reasonable accommodation and subjecting him to harassment because of his request for a reasonable accommodation, resulting in his constructive discharge."  ROA.364.  After attempts at conciliation failed, ROA.395, the Commission sued U.S. Drug Mart under the ADA for subjecting Calzada to a hostile work environment based on his disability (asthma), resulting in his constructive discharge.  ROA.7.

11

### C.   District Court's Decision

The district court granted summary judgment to U.S. Drug Mart. ROA.424, 443 (RE.8, 27).  The court began its analysis by rejecting U.S. Drug Mart's argument that the EEOC did not satisfy its administrative prerequisites prior to bringing suit.  The court held that the hostile work environment and constructive discharge claims could reasonably be expected to grow out of the investigation of Calzada's charge and that U.S. Drug Mart's claim that the EEOC did not provide notice of the hostile work environment and constructive discharge allegations during conciliation was "plainly false."  ROA.433-34 (RE.17-18).

Turning to the hostile work environment claim, the court reasoned that "a rational trier of fact could find that any harassment Mr. Calzada suffered during the argument" with Navarrette and Mosher "was sufficiently connected to his disability."  ROA.436 (RE.20).  The court also determined that U.S. Drug Mart would be vicariously liable for any actionable harassment because it came from Calzada's supervisors. ROA.442 (RE.26).

However, the court concluded that even though a reasonable jury could find the harassment sufficiently severe to alter the terms or conditions of Calzada's employment, it did not meet this Court's standard for a hostile work environment claim as a matter of law. ROA.436-42 (RE.20-26). The court was sympathetic to Calzada's situation, noting that COVID-19 was, at the time, "a new, frightening phenomenon" that "must have seemed exceedingly treacherous" to Calzada given his asthma and the necessity that he work in person at the pharmacy, "where infected individuals undoubtedly flocked." ROA.438 (RE.22). The court also noted that the no-facemask policy "was plainly contrary to the health and safety" of the U.S. Drug Mart employees, and that Mosher's taunts, threats, and intentional intimidation during the March 30 conversation "may have felt particularly intimidating and insulting" to Calzada "[g]iven the serious health risks" he faced "and the general societal tenor at that time." ROA.438-39 (RE.22-23). Indeed, the court acknowledged that the "allegations raise a question of fact ill-fitted for resolution at the summary judgment stage," ROA.438 (RE.22), and stated that "a trier of fact could

find the harassment here sufficiently severe that it altered the conditions of

Mr. Calzada's employment, created 'an abusive working environment,'

and interfered with his 'opportunity to succeed in the workplace.'"

ROA.439 (RE.23) (quoting *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321,

328, 330 (5th Cir. 2009)).

But the court characterized the harassment Calzada experienced as

an "isolated incident," and it explained that, under the precedent of this

Court, "an isolated incident of verbal harassment must be extremely severe

to change the terms and conditions of the victim's employment." ROA.439

(RE.23). Ultimately, the court explained, this Court has only found

sufficient grounds for a hostile work environment claim based on a single

instance of verbal harassment "in the context of extraordinarily offensive

racial epithets" involving "[p]articularly offensive sexual or racial

language," and such cases are "exceedingly rare." ROA.440-41 (RE.24-25)

(citation omitted). Thus, even though the court recognized that "COVID-

19 raised extreme and unusual challenges," and that "pandemic-era

harassment against frontline healthcare workers" like Calzada must "be

14

viewed in that context," it nevertheless concluded that, "as a matter of law, the harassment here was not sufficiently severe to support Plaintiff's hostile work environment claim."  ROA.441-42 (RE.25-26).

Turning to the constructive discharge claim, the court concluded that "the evidence raises a genuine issue of fact as to whether a reasonable person in Mr. Calzada's position would have felt compelled to resign." ROA.442-43 (RE.26-27).  However, because a valid hostile work environment claim is a "lesser included component" of a constructive discharge claim, and the court found itself constrained to conclude that the hostile work environment claim failed as a matter of law, it held against the EEOC on the constructive discharge claim as well.  ROA.443 (RE.27).

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo, "viewing all facts and evidence in the light most favorable to" the EEOC.  *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014).  Summary judgment is appropriate only if U.S. Drug Mart has shown that (1) "there is no genuine dispute as to any material fact and [U.S. Drug Mart] is entitled

15

to judgment as a matter of law." *Id.* (quoting Fed. R. Civ. P. 56(a)). If the "evidence is such that a reasonable jury could return a verdict" for the EEOC, "[a] genuine dispute of material fact exists," and the award of summary judgment must be reversed. *Id.* (first quoting *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013)).

## SUMMARY OF ARGUMENT

The district court agreed that a reasonable jury could find that the abuse Calzada faced because of his disability was severe enough to alter the terms or conditions of his employment. But it concluded that the harassment did not meet this Court's hostile work environment standard as a matter of law because it consisted of "an isolated incident of verbal harassment" that did not involve "extraordinarily offensive racial epithets." ROA.439-40 (RE.23-24). This was reversible error: given the unique facts of this case, the evidence of harassment was sufficient to go to a jury, and this Court's hostile work environment precedent does not compel a contrary result.

Contrary to the district court's opinion, the meeting during which Calzada's supervisors berated him for seeking to wear a mask was not the only incident of harassment; it was the culmination of multiple incidents over the course of several days.  And precedents from the Supreme Court and this Court provide that even a single instance of harassment, if "extremely serious," may establish the requisite severity to support a cognizable harassment claim.  Nothing in the statute or this Court's case law explicitly limits liability to cases involving physical violence or the use of racial epithets.  A jury considering the full context of events should have had the opportunity to determine whether the harassment here—during which Calzada's supervisors berated him and brought him to tears because he sought protection against a virus he reasonably thought could sicken or kill him, in light of his asthma—was sufficiently severe to alter the terms or conditions of his employment and create an abusive working environment.

This Court should reject any argument that the harassment arose from Calzada's "attitude" rather than his disability.  As the district court observed, the harassment was clearly connected to Calzada's disability,

17

and an employer may not avoid liability for harassment merely based on its frustration with an accommodation request.  Given the evidence that Calzada was a courteous and respectful employee, moreover, any claim that Mosher and Navarrette harassed him solely because of his allegedly poor attitude should go to a jury.

The district court also acknowledged that "the evidence raises a genuine issue of fact as to whether a reasonable person in Mr. Calzada's position would have felt compelled to resign," ROA.442-43 (RE.26-27), but it rejected the EEOC's constructive discharge claim based on the lack of a valid hostile work environment claim—a necessary "lesser included component" of constructive discharge.  ROA.443 (RE.27) (citation omitted). Because this Court's precedent should not have precluded the hostile work environment claim from going forward, however, the constructive discharge claim should have gone to a jury as well.

# ARGUMENT

## I.   A Reasonable Jury Could Have Found that Calzada's Supervisors Subjected Him to Harassment that Was Sufficiently Severe to Alter the Terms or Conditions of His Employment and Create an Abusive Working Environment.

### A.   A plaintiff establishes a hostile work environment claim with evidence of harassment that is sufficiently severe or pervasive to alter the terms or conditions of the victim's employment.

This Court recognizes a claim for a hostile work environment arising from harassment based on an individual's disability.  *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 232 (5th Cir. 2001) ("[T]he ADA embraces claims of disability-based harassment."); *see also Thompson v. Microsoft Corp.*, 2 F.4th 460, 470-71 (5th Cir. 2021).  Where, as here, the employee's supervisors are the source of the harassing behavior, "there are four elements of a hostile working environment claim: (1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome … harassment; (3) that the harassment was based on [a protected characteristic]; and (4) that the harassment affected a 'term, condition, or privilege' of employment."  *EEOC v. Boh Bros. Constr. Co.*, 731 F.3d 444, 453 (5th Cir. 2013) (en banc) (quoting *Lauderdale v. Tex. Dep't of*

19

*Crim. Just.*, 512 F.3d 157, 162-63 (5th Cir. 2007)); *see also Credeur v. La.*

*Through Office of Att'y Gen.*, 860 F.3d 785, 795 (5th Cir. 2017); *Flowers*, 247

F.3d at 235-36.

Harassment of a disabled individual in response to that individual's

request for an accommodation constitutes harassment on the basis of

disability and satisfies the third prima facie element.  *See, e.g., Fox v. Gen.*

*Motors Corp.*, 247 F.3d 169, 173-74, 179 (4th Cir. 2001) (upholding a jury

verdict on a disability harassment claim based in part on evidence that a

supervisor harassed employees who sought and received accommodations

for their disabilities); *Haysman v. Food Lion, Inc.*, 893 F. Supp. 1092, 1107-11

(S.D. Ga. 1995) (holding that a reasonable jury could find for the plaintiff

on his ADA-based harassment claim when, in response to his placement on

light duty as a reasonable accommodation, his supervisor punched or

kicked injured parts of his body, his manager berated him in front of other

employees, and he was scheduled for the store's most undesirable shifts);

*see also* 29 C.F.R. § 1630.12(b) ("[I]t is unlawful to coerce, intimidate,

threaten, *harass* or interfere with any individual in the exercise or

20

enjoyment of ... any right granted or protected by this part." (emphasis added)).

In a related context, courts have concluded that harassment stemming from an employee's request for a religious accommodation may create an actionable hostile work environment under Title VII. *See, e.g.*, *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 279 (3d Cir. 2001) (holding that a reasonable jury could find that hostility directed towards an Orthodox Jewish college professor regarding her request for a religious accommodation constituted harassment based on religion); *Ibraheem v. Wackenhut Servs., Inc.*, 29 F. Supp. 3d 196, 214 (E.D.N.Y. 2014) (holding that a reasonable jury could conclude that the plaintiff was subjected to unlawful religious harassment after receiving an exception to the employer's no-beard policy as a reasonable accommodation).

With respect to the final prima facie element—whether the harassment is sufficiently abusive to alter the terms, conditions, or privileges of employment—the court must "consider the entirety of the evidence in the record, including 'the frequency of the discriminatory

21

conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.'"  *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 585 (5th Cir. 2020) (quoting *Credeur*, 860 F.3d at 796); *see also Boh Bros. Constr. Co.*, 731 F.3d at 453 ("Ultimately, whether an environment is hostile or abusive depends on the totality of circumstances.").  "Simple teasing," "offhand comments," and most "isolated instances" will not meet this standard, but an "extremely serious" incident may be sufficient to effect a discriminatory change in the terms or conditions of employment.  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted).

This severity assessment must include "careful consideration of the social context in which particular behavior occurs and is experienced by its target."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998); *id.* at 82 (noting that facts must be assessed with "[c]ommon sense, and an appropriate sensitivity to social context").  To this end, courts must consider those elements of the harassment that may exacerbate its effect on the victim.  As the Supreme Court has recognized, "acts of supervisors

have greater power to alter the environment than acts of coemployees generally." *Faragher*, 524 U.S. at 805.  For this reason, "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998).  Age differences between harasser and victim may have a similarly aggravating effect on the harassment, increasing the work environment's hostility.  *EEOC v. Mgm't Hosp. of Racine, Inc.*, 666 F.3d 422, 432 (7th Cir. 2012) ("Given the age difference between [plaintiff] and [the harasser] and [the harasser's] position of authority over her, a rational jury could have concluded that [the harasser's] verbal and physical harassment directed at [plaintiff] created an objectively hostile and abusive work environment."). Courts deem harassment that includes physical threats and humiliation particularly hostile or abusive.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993); *Flowers*, 247 F.3d at 236.

**B.  Taking into account the full context of the harassment Calzada faced, a reasonable jury could find that it met the standard for a hostile work environment.**

As the district court explained, a reasonable jury, considering both the harassment to which Calzada was subjected and the context in which it occurred, could conclude that it was severe enough to alter the terms or conditions of his employment and create an abusive working environment. ROA.439 (RE.23) (quoting *Stewart*, 586 F.3d at 328).  At the time of the harassment, Calzada was a young man barely out of his teens engaged in his first paying job.  He suffered from asthma and was confronting the possibility of exposure to a potentially deadly disease.  The uncertainty about the scope and severity of COVID-19 during these "alarming early days" of the pandemic, ROA.438 (RE.22), heightened anxieties involving the disease's transmissibility and potentially devastating effect on those who developed it.  Despite the lack of definitive knowledge about the virus at the time, early reports indicated that those with asthma, like Calzada, were both more susceptible to COVID and had worse outcomes on average once they contracted it.  Calzada demonstrated the rational nature of his

24

fear in saying to Mosher and Navarrette, "I'm asthmatic. This whole thing, if I get it, inflammation in the lungs, and that's it for me." ROA.354 (RE.38).

Other aspects of Calzada's position heightened his rational concerns about his health. His pharmacy technician position dealt with the public and could not be performed remotely. ROA.347-48 (RE.31-32). In addition, as a frontline worker, Calzada faced a far greater likelihood of interacting with infected people than a member of the general public. ROA.356 (RE.40) (noting that pharmacy employees were "more at risk because we take care of those sick people"). As the district court cogently summarized his situation:

> For someone like Mr. Calzada, COVID-19 must have seemed exceedingly treacherous: as an asthmatic, he was part of a high-risk group; he was employed in a pharmacy, where infected individuals undoubtedly flocked; yet he could not, like so many others, work virtually—he had to show up, which greatly imperiled his health and safety. Thus, he was no eggshell complainant for fearing the virus and demanding the right to wear a mask.

ROA.438 (RE.22).

It was in this context that Calzada sought to wear a mask at work to avoid contracting a virus that by all accounts could severely jeopardize his health and possibly endanger his life.  Under these conditions, rules regarding mask usage were not simply issues of workplace decorum; they seemed, quite literally, like matters of life and death.  *See, e.g.*, ROA.438, 441 (RE.22, 25) (noting that "at the time," COVID-19 "was a new, frightening phenomenon" that "raised extreme and unusual challenges").  But when Calzada attempted to raise these concerns with his supervisors, he was rebuffed and, twice, told he could not work his scheduled shift unless he was willing to put himself at serious risk.  ROA.266-69 (RE.48-51); ROA.438 (RE.22) ("Defendant's policy of prohibiting facemasks—allegedly because allowing them would stir up fear within the community—was plainly contrary to the health and safety of Fabens Pharmacy employees, as was Ms. Navarrette's decision to enforce that policy.").  Both times, Calzada went home without pay.  ROA.268-69 (RE.50-51).  These preceding days must be considered for a complete understanding of the effect on Calzada of his supervisors' harassment.  *See, e.g., Septimus v. Univ. of Hous.*, 399 F.3d

601, 612 (5th Cir. 2005) (examining several "incidents" of harassing conduct to determine whether they "collectively" established a valid claim of harassment under Title VII); *Holloway v. Maryland*, 32 F.4th 293, 301 (4th Cir. 2022) (explaining that a specific instance of harassment alleged to create an abusive environment must be considered in conjunction with other allegations establishing context).

Upon his return to work, supervisors Navarrette and Mosher told Calzada that COO Paschal had decided to allow masking, but then began to berate him harshly for the ostensibly inappropriate manner in which he chose to raise the issue of protecting himself from a potentially fatal disease.  Because Calzada sought to wear a mask for his own protection, and did not agree to place his employer's needs ahead of his reasonable health concerns (or agree to "meet halfway" in some unspecified fashion, ROA.357 (RE.41)), Mosher told him he would "have sent [Calzada] packing" and "would still fire [Calzada's] ass right now" if it were up to him because Calzada "didn't give a damn about [his] employer." ROA.349, 352 (RE.33, 36).  Along these lines, they told Calzada that his

27

attempts to protect himself constituted showing a "complete lack of respect" and a poor "attitude" that needed to be "disciplined and controlled." ROA.348-50 (RE.32-34). Raising his health concerns, in their estimation, rendered Calzada "a disrespectful, stupid little kid … stupid as you can be," who was "acting like a five-year-old child." ROA.348-49, 352, 357 (RE.32-33, 36, 41). And children, Mosher warned him, "usually get locked in their rooms for a while or even spanked" when they assert themselves. ROA.350-51 (RE.34-35).

Instead, they told Calzada, his only "respectful" options were to agree not to wear a mask—a choice that he reasonably perceived to put his life at risk—or quit. ROA.351 (RE.35). In this vein, Mosher told him that if he wanted to protect himself, his "protection is to walk out the door and never come back." ROA.352 (RE.36). Mosher then taunted him, saying that working in the store is "obviously something that scares you to death, so why are you even here now?" ROA.352-53 (RE.36-37).

Mosher admitted that his actions constituted "an intimidating verbal attack … [t]he point of which was to be threatening."[2]  ROA.293; *see also* ROA.287 (RE.54).  In this, Mosher was successful: at some point during his diatribe, Calzada began crying.  ROA.311; *see also* ROA.439 (RE.23) ("Given the serious health risks Mr. Calzada faced, and the general societal tenor at that time, Mr. Mosher's words may have felt particularly intimidating and insulting.").

Importantly, Mosher and Navarrette were the highest-ranking individuals in the pharmacy and were in charge of hiring, discipline, and termination.  ROA.298, 301, 303-04, 336.  This power imbalance heightened the intimidating effect of their harassment of Calzada.  *See Ellerth*, 524 U.S. at 763 (noting that the "power and authority" of a supervisor "invests his or her harassing conduct with a particular threatening character"); *Faragher*, 524 U.S. at 805 (noting that supervisors are better positioned than coworkers to alter the workplace environment through acts of harassment).

---

[2] Mosher also conceded that his actions violated U.S. Drug Mart's Workplace Violence Prevention Policy, which requires treating all employees "with courtesy and respect at all times."  ROA.291 (RE.58).

In addition, Calzada was barely out of his teens, while Mosher was sixty-eight. ROA.297. Mosher himself recognized the importance of their age difference when reflecting on his conduct, testifying at deposition, "I'm a whole lot older person than he is. I have lived a whole lot more life. I should have a little more control over how I treat people. And I didn't." ROA.290 (RE.57). Especially in light of Calzada's youth and inexperience in the workforce, a reasonable jury could find that this age gap intensified the effect of the harassment in creating a hostile environment. *Mgmt. Hosp. of Racine*, 666 F.3d at 433 (explaining that an age difference between harasser and victim, coupled with the harasser's position of authority, could lead to a finding that the harassment "created an objectively hostile and abusive work environment").

The threats of termination inherent in Mosher's statements "I would still fire your ass right now" and "[y]our protection is to walk out the door and never come back," ROA.352 (RE.36), further exacerbated the harassing effect of the encounter. *See, e.g.*, *Ellerth*, 524 U.S. at 754 (noting that threats can contribute to a hostile work environment). And a jury could also

30

conclude that Mosher telling Calzada he was "going to be treated like a little kid when you act like a little kid," and that "little kids" get "spanked" when they question authority figures, ROA.350 (RE.34), could be interpreted as at least an implicit physical threat.  As this Court has recognized repeatedly, physical threats are more likely to make harassment sufficiently abusive to alter the terms or conditions of employment.  *Clark*, 952 F.3d at 585; *Credeur*, 860 F.3d at 796; *Flowers*, 247 F.3d at 236.

The harassment at issue here is a far cry from the type of "[s]imple teasing, offhand comments," and less serious "isolated incidents" the Supreme Court described as generally insufficient to state a claim of actionable harassment in *Faragher.*  524 U.S. at 788.  As *Faragher* makes clear, the Court intended this exception to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, … jokes, and occasional teasing."  *Id.* (citation omitted). The Court applied the standard to ensure that Title VII "not become a 'general civility code.'"  *Id.* (quoting *Oncale*, 523 U.S. at 80).

31

Such concerns do not apply to the situation at bar.  Calzada sought to take basic precautionary steps to protect himself from COVID exposure because his disability gave him heightened susceptibility to the potentially fatal disease.  In response, his supervisors accused him of showing a "complete lack of respect," told him he was "acting like a little kid," called him "stupid as [he] can be," taunted him for his fear of the disease, and threatened him with termination, bringing him to tears.  ROA.348-53 (RE.32-37); ROA.311.  The only "respectful" way to raise his concerns, they told him, was to show a willingness to forego the necessary accommodation.  ROA.348-52, 357 (RE.32-36, 41).  Particularly in light of the extreme dangers COVID posed, this harassment was categorically different from the "civility code" concerns *Faragher* attempted to address through its exclusion of teasing, offhand comments, and less serious isolated incidents.  *See* ROA.438 (RE.22) (noting that Calzada "was no eggshell complainant for fearing the virus and demanding the right to wear a mask").

A distinction the Tenth Circuit drew in a harassment case, *Morris v. City of Colorado Springs*, 666 F.3d 654 (10th Cir. 2012), illustrates the relevance of potential danger from communicable disease to the hostile work environment analysis. The plaintiff in *Morris*, a surgical nurse, contended that a male doctor harassed her, made demeaning comments to her, twice "flick[ed]" her on the head with his finger, and threw pericardium tissue onto her unprotected leg during surgery, then joked about it. *Id.* at 658-59. The court ultimately rejected her harassment claim, holding that the doctor's behavior, though "unquestionably juvenile," did not create a hostile work environment because it "could not reasonably be viewed as threatening or severe" and therefore did not "objectively alter[] the terms and conditions of [plaintiff's] employment." *Id.* at 668; *id.* at 664 (explaining that "the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim"). Importantly, however, the court went on to observe that a single incident of harassment that puts a plaintiff in fear of contracting "a deadly and communicable disease" might

33

indeed lead a reasonable person to "perceive the conduct as threatening or severe," and might therefore be sufficient to establish a hostile work environment claim. *Id.* at 668 n.7.

In sum, COVID-19 presented a uniquely threatening situation, particularly to frontline healthcare workers with enhanced risk factors like asthma, and the harassment at issue must be understood in that context. A reasonable jury exercising appropriate sensitivity to all of the relevant factors—the fear and uncertainty during the early days of COVID; Calzada's young age and lack of experience in the workforce; the danger posed to his health from working at the pharmacy without a mask, heightened by his asthma and the public-facing nature of his job; the belittling, demeaning, and humiliating way his older supervisors berated him, in language including at least implicit threats of termination and physical violence; and the days leading up to the harassing conversation in which Calzada was twice sent home without pay because he sought to protect himself by wearing a mask—could find that the verbal attack on Calzada was in fact "extremely serious." *Faragher*, 524 U.S. at 788; *see also*

*Berry v. Chi. Transit Auth.*, 618 F.3d 688, 692 (7th Cir. 2010) ("[A] single act

can create a hostile environment if it is severe enough."); *Mathirampuzha v.

Potter*, 548 F.3d 70, 78-79 (2d Cir. 2008) (explaining that a single event, if

"extraordinarily severe," can result in an "intolerable alteration" of the

working environment and may be sufficient to meet the severe or

pervasive standard); *Hickman v. Laskodi*, 45 F. App'x 451, 454-55 (6th Cir.

2002) (holding that a single incident where correctional facility supervisor

threatened female subordinate with physical harm and made her "fear for

her life" was sufficient to survive summary judgment).

Presented with this context, a reasonable jury could have concluded

that the harassment Calzada experienced was sufficiently intimidating and

threatening to alter the terms, conditions, or privileges of his employment.

*See Oncale*, 523 U.S. at 81-82; *Flowers*, 247 F.3d at 235-36.  Indeed, the district

court explicitly concluded as much.  *See* ROA.439 (RE.23) ("The court is …

convinced a trier of fact could find the harassment here sufficiently severe

that it altered the conditions of Mr. Calzada's employment, created 'an

abusive working environment,' and interfered with his 'opportunity to

succeed in the workplace.'" (quoting *Stewart*, 586 F.3d at 328)); ROA.438

(RE.22) (noting that "Plaintiff's allegations raise a question of fact ill-fitted

for resolution at the summary judgment stage").  The court therefore erred

in concluding that summary judgment was warranted under this Court's

precedent simply because the harassment did not also include physical

assault or "[p]articularly offensive sexual or racial language."  ROA.440-41

(RE.24-25) (citation omitted).

### C.  The cases the district court relied on to conclude that the harassment was insufficiently severe to meet this Court's hostile work environment standard are distinguishable.

Despite its conviction that the hostile work environment claim should

have gone to a jury, the district court found itself constrained to grant

summary judgment in favor of U.S. Drug Mart based on its interpretation

of the scope of this Court's precedent.  ROA.438-42 (RE.22-26).  But the

cases on which the court relied do not compel its conclusion.  Although the

district court was correct that "cases in which a single incident was found

to be sufficiently 'severe or pervasive' to support a hostile work

environment are exceedingly rare," and tend to arise only in the context of

physical assault or "[p]articularly offensive sexual or racial language,"

ROA.440-41 (RE.24-25) (citation omitted), this Court has never purported to

restrict a valid hostile work environment claim to those contexts

exclusively. The cases the district court principally relied on concerned

sophisticated professionals objecting to reprimands about work

performance issues, rather than the fundamental threat to health and safety

that Calzada faced. None of these decisions foreclose the extreme facts at

issue here from meeting this Court's high standard.

In *Septimus*, for example, the plaintiff worked as an Assistant General

Counsel for a large public university. 399 F.3d at 604. She described an

incident in which the university's General Counsel "spent two hours in

[her] office 'haranguing' her while they discussed work matters" in front of

a coworker, which resulted in her "sob[bing] uncontrollably." *Id.* at 605.

Septimus testified that the incident "frightened her and made her feel

useless and incompetent." *Id.* at 612. She also described the General

Counsel "question[ing] her about a presentation in a 'mocking tone'" and

referred to her once as acting "like a needy old girlfriend." *Id.*

37

Importantly, however, when taking the full context into account, the harassment at issue in that case was not nearly as aggressive or threatening as what Calzada endured. Septimus was an experienced attorney, not a twenty-year-old employed in his first paying job. *Id.* at 604-05. The harassment directed towards her was based on work matters, not a requested accommodation to reduce the risk of exposure to a potentially lethal disease. *Id.* at 605. And although Septimus testified that the General Counsel was "scornful" towards her and "lectured [her] relentlessly and sternly," the evidence also indicated that he "did not yell" and "avoided using profane or inappropriate language." *Septimus v. Univ. of Hous.*, Civ. No. H-00-3307, slip op. at 2 (S.D. Tex. Jan. 24, 2002). It was in this context that the court ultimately held that the incidents of harassment "were collectively insufficient to establish that [the supervisor's] harassment was severe or pervasive enough to make her working environment objectively hostile or abusive." *Septimus*, 399 F.3d at 612.

Similarly, in *Saketkoo v. Administrators of Tulane Educational Fund*, 31 F.4th 990 (5th Cir. 2022), the plaintiff was an associate professor at a

medical school who alleged that her supervisor routinely ridiculed her and, in one incident, berated her in a manner she found intimidating. *Id.* at 995-96, 1003-04. The court characterized the harassment as "sporadic and abrasive conduct" that was "neither severe nor pervasive" enough to sustain a hostile work environment claim. *Id.* at 1003-04. Again, the factual context in *Saketkoo* markedly differed from the harassment Calzada experienced. The plaintiff was an experienced professional with advanced degrees, the harassment arose from a discussion about work rather than a workplace policy reasonably perceived as putting the victim's life at risk, and the precipitating exchange was relatively brief. *Id.* at 995-96; *see also Pennington v. Tex. Dep't of Fam. & Protective Servs.*, No. A-09-CA-287, 2010 WL 11519268, at *11 (W.D. Tex. Nov. 23, 2010) (rejecting as insufficient a senior manager's hostile work environment claim based in part on incident when her supervisor "slammed files, doors, and was physically threatening" toward her), *aff'd on other grounds*, 469 F. App'x 332, 336 (5th Cir. 2012).

In a footnote, the district court here also cited a number of cases from other circuits to support its conclusion that a single incident involving extensive verbal harassment is generally insufficient to establish a hostile work environment claim.  ROA.441 (RE.25).  As out-of-circuit cases, of course, these decisions are not binding on this Court.  In addition, the contexts of these cases make them distinguishable.

*Brooks v. Grundmann*, 748 F.3d 1273 (D.C. Cir. 2014), involved a plaintiff who was a Team Leader with seven years of experience who complained about a single incident of a supervisor throwing a notebook "aimed in her direction" because of frustration with the quality of her work presentation.  *Id.* at 1275, 1277.  She also disputed several subsequent performance reviews, and believed that an attendance policy was selectively enforced against her.  *Id.* at 1275.  The relative age and experience of the plaintiff, as well as the context of the abuse (arising from disappointment over the quality of a work presentation rather than an accommodation request during a time of heightened health fears), make *Brooks* inapposite.  Similarly, in *Holloway v. Maryland*, 32 F.4th 293 (4th Cir.

2022), the court affirmed dismissal of a Program Director's hostile work environment claim based on one episode of yelling about work-related matters and other incidents related to his work performance. *Id.* at 296-97, 301. The seniority of the harassment victim and the supervisor's focus on work-related matters rather than the victim's proposed reasonable accommodation are quite different from the facts at issue here. *See, e.g., id.* at 301 ("Evaluation and criticism of one's work performance, while perhaps unpleasant, is not abusive.").

The other cases the district court cited involve similarly distinguishable facts. *See Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1116-18 (7th Cir. 2022) (holding that use of a racial epithet by someone who did not supervise the plaintiff (about which plaintiff learned second-hand, several months after it was uttered) could not make out a claim of racial harassment, and plaintiff lacked evidence showing that her supervisor's harassing conduct was related to her gender or sufficiently threatening or humiliating to alter her working conditions); *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 538-39 (8th Cir. 2020) (holding that incidents of

41

immature and insensitive behavior—different in kind from those at issue in

Calzada's case—were "inappropriate" and should have made the

perpetrators "embarrassed and ashamed," but were nevertheless

insufficient to meet the severe-or-pervasive standard); *Morris*, 666 F.3d at

668 (affirming summary judgment against surgical nurse on her hostile

work environment claim because a doctor's behavior during surgery, while

"unquestionably juvenile, unprofessional, and perhaps independently

tortious," was nevertheless not "threatening or severe").  As with the

precedents from this Court discussed above, none of these cases provide a

rationale to reject the hostile work environment claim here in light of the

unique and extreme facts that gave rise to it.

### D.  U.S. Drug Mart's claim that the harassment stemmed from Calzada's "attitude" rather than his disability does not support summary judgment.

U.S. Drug Mart argued before the district court that Mosher and

Navarrette harassed Calzada because they were "upset about [his] attitude,

not [his] alleged disability or his request for accommodation."  ROA.72-74.

For this reason, it contended that the harassment was conclusively not

"based on [Calzada's] disability," as required to make out a prima facie claim of harassment. ROA.72-74. To the extent U.S. Drug Mart attempts to raise the argument again on appeal, this Court should follow the district court's example and reject it out of hand. *See* ROA.435-36 (RE.19-20).

As the district court explained, "Calzada's request to wear a mask was based on his asthma disability. He told his supervisors the request pertained to his disability. And although the argument he later had with them primarily revolved around their frustration with what they saw as his insubordination, his disability was the central topic. Absent his disability, there would have been no argument." ROA.435-36 (RE.19-20). In light of these undisputed facts, the court concluded, a rational jury could find that the harassment Calzada experienced "was sufficiently connected to his disability." ROA.436 (RE.20). This is precisely right.

Furthermore, as a matter of law, this explanation does not immunize U.S. Drug Mart's behavior. Calzada's supervisors subjected him to a hostile environment because he was unwilling to abide by a decision he reasonably perceived to put his health at risk. ROA.348-53 (RE.32-37).

43

Treating this response as valid—allowing U.S. Drug Mart to interpret

Calzada's insistence on a reasonable accommodation as potentially

terminable insubordination, and a license to abuse him at length—would

vastly undercut the ADA's protections.  As the First Circuit explained, an

"employer cannot invoke the specter of insubordination in order to mask []

retaliation for requesting [an] accommodation."  *Kelley v. Corr. Med. Servs.,*

*Inc.*, 707 F.3d 108, 118 (1st Cir. 2013) (internal quotation marks and citation

omitted); *see also Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 200 (7th Cir.

2011) (holding that an employer may not rely on "a disingenuous

overreaction to justify dismissal of an annoying employee who asserted

[her] rights under the ADA"); *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d

183, 190 (3d Cir. 2003) (explaining that an employer may not terminate an

employee because it is "tired of her persistent requests for an

accommodation"); *Haysman*, 893 F. Supp. at 1109 ("An employer may

reprimand recalcitrant employees whether disabled or not, but an

employer is not free to harass or abuse a disabled individual over the direct

44

consequences of his disability any more than the employer is free to call
him a 'gimp' or other epithets.").

In addition, the record shows that Calzada was, by all accounts, a
courteous and respectful employee with no history of insubordinate
behavior. *See* ROA.344-60 (RE.28-44) (transcript of Calzada conversation
with Mosher and Navarrette, during which he repeatedly addressed
Mosher as "sir"); ROA.291-92 (RE.58-59) (testimony of Mosher that Calzada
never cursed at him and never spoke to him in a way he considered
disrespectful prior to the March 30 conversation); ROA.337, 342 (testimony
of Senior Pharmacy Tech Primero that Calzada was a "good kid" who had
never acted aggressively toward him).  Thus, whether Calzada's request to
wear a mask to reduce the risk of contracting COVID constituted
disobedience, and whether Mosher and Navarrette could have reasonably
interpreted Calzada's behavior as insubordinate or indicative of a poor
attitude, are at the very least material issues of disputed fact not susceptible
to resolution on summary judgment.  Accordingly, U.S. Drug Mart's

45

asserted explanation for Mosher and Navarrette's harassing behavior does

not support an award of summary judgment.

## II.  A reasonable jury could agree with the district court and find that a reasonable person in Calzada's position would have felt compelled to resign.

To establish a claim of constructive discharge, a plaintiff must show

"circumstances of discrimination so intolerable that a reasonable person

would resign."  *Green v. Brennan*, 578 U.S. 547, 560 (2016); *see also Pa. State*

*Police v. Suders*, 542 U.S. 129, 141 (2004) ("The inquiry is objective: Did

working conditions become so intolerable that a reasonable person in the

employee's position would have felt compelled to resign?"); *Perret v.*

*Nationwide Mut. Ins. Co.*, 770 F.3d 336, 338 (5th Cir. 2014).  Only such

"objective intolerability" must be shown; the plaintiff need not also

demonstrate that the employer deliberately imposed such intolerable

conditions with the purpose of forcing the employee to quit.  *Green*, 578

U.S. at 560; *see also Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*,

512 F.3d 157, 167 (5th Cir. 2007); *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d

61, 65 (5th Cir. 1980).

Here, the district court found that "the evidence raises a genuine issue of fact as to whether a reasonable person in Mr. Calzada's position would have felt compelled to resign." ROA.442-43 (RE.26-27). But the court recognized that the Supreme Court has described a hostile work environment as being a "lesser included component" of the "graver" hostile-environment constructive discharge claim. ROA.443 (RE.27) (quoting *Suders*, 542 U.S. at 149); *see also Brown v. Kinney Shoe Corp.* 237 F.3d 556, 566 (5th Cir. 2001) ("Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim."). Thus, the court believed itself constrained to grant summary judgment on the constructive discharge component of the EEOC's complaint as well. ROA.443 (RE.27).

As explained above at pages 23-35, however, a reasonable jury could find that the Commission successfully established a hostile work environment claim. And as the district court observed, a reasonable jury could also find that a reasonable person in Calzada's position would have felt compelled by the hostile environment to resign. ROA.442-43 (RE.26-

47

27).  Indeed, an employee whose requests for a reasonable accommodation to provide protection against exposure to a potentially deadly disease are met with derision, scorn, abuse, and threats of termination that "humiliat[e]" and "degrade[]" him, ROA.277, may well feel no choice but to quit.  *Cf.* ROA.438 (RE.22) (noting that U.S. Drug Mart's policy prohibiting facemasks, as well as the decision to enforce that policy, were "plainly contrary to the health and safety of [its] employees").  Thus, the Commission respectfully requests that this Court reverse the district court's rejection of the constructive discharge claim as well.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed and the case remanded for further proceedings.

Respectfully submitted,

GWENDOLYN YOUNG REAMS
Acting General Counsel

JENNIFER S. GOLDSTEIN
Associate General Counsel

DARA S. SMITH
Assistant General Counsel

/s/ Jeremy D. Horowitz
JEREMY D. HOROWITZ
Attorney
U.S. EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., Fifth Floor
Washington, D.C. 20507
(202) 921-2549
jeremy.horowitz@eeoc.gov

**CERTIFICATE OF SERVICE**

I, Jeremy D. Horowitz, hereby certify that I electronically filed the

foregoing brief with the Court via the appellate CM/ECF system on this

11th day of April, 2023, and I will file paper copies of the brief upon the

Court's request.  I also certify that all counsel of record have consented to

electronic service by virtue of Fifth Circuit Rule 25.2.3 and will be served

the foregoing brief via the Court's appellate CM/ECF system.

/s/ Jeremy D. Horowitz
JEREMY D. HOROWITZ
Attorney
U.S. EQUAL EMPLOYMENT
 OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., Fifth Floor
Washington, D.C. 20507
(202) 921-2549
jeremy.horowitz@eeoc.gov

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations set forth in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 8,582 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as determined by the Microsoft Word for Office 365 ProPlus word processing program.

The brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Palatino Linotype 14-point font, a proportionally spaced typeface, for text and footnotes.

/s/ Jeremy D. Horowitz
JEREMY D. HOROWITZ
Attorney
U.S. EQUAL EMPLOYMENT
  OPPORTUNITY COMMISSION
Office of General Counsel
131 M St. N.E., Fifth Floor
Washington, D.C. 20507
(202) 921-2549
jeremy.horowitz@eeoc.gov

Dated: April 11, 2023